UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :
IN RE                                     :         08 Civ. 3536 (WHP)
                                          :
AGRIA CORPORATION                         :
SECURITIES LITIGATION                     :         MEMORANDUM & ORDER
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        This putative class action alleges violations of the federal securities laws in connection with Defendant Agria Corporation's ("Agria") initial public offering ("IPO") of American Depository Shares ("ADSs"). Specifically, Lead Plaintiff Nijat Tonyaz ("Plaintiff") alleges Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77 et seq. The Consolidated Amended Class Action Complaint ("Amended Complaint" or "Amended Compl.") dated February 3, 2009, names Agria; its officers and directors—Guanglin Lai ("Lai"), Kenneth Hua Huang, Gary Kim Ting Yeung, Zhaohua Qian ("Qian"), Zhixin Xue ("Xue"), Geoffrey Duyk, Shangzhong Xu, Jiuran Zhao, and Terry McCarthy—(collectively, the "Individual Defendants"); Brothers Capital Limited ("BCL"); and its underwriters—Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., Piper Jaffray & Co., and CIBC World Markets Corp.—(the "Underwriter Defendants") as Defendants. Agria and the Underwriter Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims against them.[1] For the following reasons, their motion to dismiss is granted.

---

[1] At the time this motion was filed, Plaintiffs had not effected service on all of the Individual Defendants. On June 4, 2009, the Individual Defendants notified the Court of their intention to

## BACKGROUND

### I. The Parties

Agria is a Cayman Islands holding company. Through its subsidiaries and affiliates, Agria engages in the research, development, production, and sale of agricultural products in the People's Republic of China. (Amended Compl. ¶¶ 22, 29.) Because Chinese law forbids foreigners from owning over 50% of any seed development and production business in China, Agria conducts substantially all of its operations through contractual arrangements with Primalights III Agriculture Development Co., Ltd. ("P3A"). P3A holds the requisite licenses and permits for these businesses in China. (Amended Compl. ¶¶ 22-23, 29, 32.) P3A is owned by 4 individuals: Juan Li (the wife of Defendant Lai), Defendant Qian, Defendant Xue, and Mingshe Zhang. (Amended Compl. ¶ 23.)

During the relevant time period, Lai was Chair of Agria's Board of Directors (the "Board") and Co-Chief Executive Officer. (Amended Compl. ¶ 8.) He is also the sole shareholder and a director of BCL that, in turn, is Agria's largest shareholder. (Amended Compl. ¶¶ 8, 24.) Xue served as Agria's Chief Operating Officer ("COO") and as a member of the Board during the relevant period. (Amended Compl. ¶ 12.)

### II. The Registration Statement & Prospectus

On November 5, 2007, Agria filed a form F-1/A Registration Statement with the SEC for the IPO (the "Registration Statement"). (Amended Compl. ¶ 25.) On November 7, 2007, the Prospectus became effective and more than 17.15 million ADSs were sold to the public, at $16.50 per share. The IPO raised $282 million. (Amended Compl. ¶ 26.) Agria sold 12 million

---

move to dismiss the Amended Complaint. The reasoning in this Memorandum and Order applies with equal force to the claims asserted against the Individual Defendants.

ADSs and BCL sold the balance of the IPO shares. (Amended Compl. ¶ 26.)

The Registration Statement underscores the importance of P3A to Agria's business and notes that Agria's contractual arrangement with P3A and P3A's shareholders enabled Agria to "exercise effective control over P3A." (Amended Compl. ¶ 32.) The Registration Statement warns that:

> <u>Our business depends substantially on the continuing efforts of our management, and our business may be severely disrupted if we lose their services.</u>
>
> Our future success depends significantly upon the continued services of our management, especially in the case of our primary operating entity, P3A. . . . If one or more of our key management personnel are unable or unwilling to continue in their present positions we may not be able to replace them easily or at all. The loss of the services of our key management personnel, in the absence of suitable replacements, could have a material adverse effect on our operations and financial condition, and we may incur additional expenses to recruit and train personnel. Each member of our management team has entered into an employment agreement with us, which contains confidentiality and non-competition provisions. If disputes arise between our management and us in light of the uncertainties within the [People's Republic of China] legal system, there is a risk that some of the provisions of these agreements may not be enforced or enforceable in China, where our managers reside and hold most of their assets.

(Amended Compl. ¶ 33 (emphasis in the original).)

The Registration Statement also cautions investors about the risks of a P3A shareholder breaching his agreement with Agria:

> <u>The shareholders of P3A may breach our agreements with them or may have potential conflicts of interest with us, and we may not be able to enter further agreements to derive economic benefits from P3A, which may materially and adversely affect our business and financial condition.</u>
>
> The shareholders of P3A . . . may breach or refuse to renew the existing contractual arrangements with us that allow us to effectively control P3A, and receive economic benefits from its operations. There is a risk that they will not always act in the best interests of our company. We do not have existing arrangements to address potential conflicts of interest between these individuals and our company. We rely on these individuals to abide by the contract laws of

> China and honor their contracts with us. . . . If we cannot resolve any conflicts of interest or disputes between us and the shareholders of P3A or if the shareholders breach our agreements with them, we would have to rely on legal proceedings, which may result in disruption to our business. There is also substantial uncertainty as to the outcome of any such legal proceedings.

(Amended Compl. ¶ 37 (emphasis in the original).)

III.  The April & June 2008 Disclosures

On April 7, 2008, Agria issued a press release titled, "Zhixin (Frank) Xue Resigned as COO of Agria; Xue Will Remain Chairman of [P3A]" (the "April 2008 Press Release"). The April 2008 Press Release announced that Xue had informed Agria's Board of Directors on March 26, 2008, that he intended to resign from his positions with Agria, but remain chair and legal representative of P3A. (Amended Compl. ¶ 40.) The April 2008 Press Release acknowledged that Agria could be materially harmed if additional P3A owners decide to leave the company and that it might be difficult to replace Xue. (Amended Compl. ¶ 40.)

The April 2008 Press Release described the background of Xue's resignation and what it characterized as "the Proposed Transaction." (Amended Compl. ¶ 41.) Specifically, the April 2008 Press Release disclosed that the Board learned in late January 2008 that Lai and Xue had been discussing payment of $18 million in cash to Xue and the transfer of Agria shares owned by BCL and representing 22% of the company to Xue and his designees among P3A management. (Amended Compl. ¶ 41.) The April 2008 Press Release also stated that Lai told the Board that BCL would make the payment and share transfer, provided that Xue ensured P3A management's continuing service and Agria's control over P3A. (Amended Compl. ¶ 41.) Lai also told the Board he believed that the Proposed Transaction would "provide [an] incentive for [P3A's owners'] continued service and align their interests with those of the shareholders of [Agria]." (Amended

Compl. ¶ 41.) The April 2008 Press Release also disclosed the Board's concern "about the potential adverse impact of the proposed transaction on [Agria's] business, financial condition and results of operations, as well as whether a similar situation would happen in the future." (Amended Compl. ¶ 41.)

Despite these concerns, the April 2008 Press Release announced that the Board approved a payment of $9 million from BCL to Xue on February 4, 2008, and that the Board had agreed to consider an additional $9 million payment if certain conditions were met. (Amended Compl. ¶ 41.) At a subsequent Board meeting, a Special Committee was appointed to determine whether the conditions set in February were met. (Amended Compl. ¶ 41.) Before the Special Committee reached a determination, Xue informed the Board on March 5, 2008 of his intent to resign from Agria "because he did not receive any response from the Special Committee and did not believe the Board or the Special Committee had the ability to resolve all important matters of the company." (Amended Compl. ¶ 41.) On March 7, 2008, the Board declined to accept Xue's resignation. A day later, Xue withdrew his letter of resignation. (Amended Compl. ¶ 41.) However, on March 26, 2008, Xue reversed course again and announced his resignation for a second time. (Amended Compl. ¶ 42.) The Special Committee responded by causing BCL to deposit $9 million in cash and 27,808,000 Agria shares, representing 22% of the total shares issued and outstanding, into an escrow account for Xue and the other P3A managers. (Amended Compl. ¶ 42.) Finally, the April 2008 Press Release disclosed that BCL's payment would result in charges to Agria's earnings. (Amended Compl. ¶ 43.)

The April 2008 Press Release attached translated copies of Xue's resignation emails to the Board. (Amended Compl. ¶ 44.) In his March 5 email, Xue informed the Board that, while

he and his management team had satisfied the conditions set by the Board, the Board failed to make the payments or provide a timeline. Xue questioned whether the Board's failure "inevitably makes people question the seriousness of its decision and its ability to resolve all important internal and external matters of [Agria]." (Amended Compl. ¶ 44.) Xue also observed in his email that he did not think that "the current composition of the Board [was] reasonable, could effectively strengthen [Agria's] corporate governance or [had] the ability to make independent judgment[s]" and that it was "unable to fully protect the ultimate interests of [Agria] and all shareholders." (Amended Compl. ¶ 44.) Xue also noted he had repeatedly sought to restructure Agria's Board. (Amended Compl. ¶ 44.) Xue's email concluded with the tender of his resignation. (Amended Compl. ¶ 44.)

On June 2, 2008, Agria announced an agreement with Xue and other P3A managers resolving their dispute and restructuring P3A. (Amended Compl. ¶ 47.) The $18 million payment and 22% stake in Agria were distributed to Xue and his designated P3A managers. (Amended Compl. ¶ 47.) BCL's $18 million cash payment was recorded as a charge against Agria's earnings. (Amended Compl. ¶ 47.)

IV. Plaintiff's Allegations of Misstatements By Agria

Plaintiff contends that Agria failed to disclose the negotiations at the time of the IPO between Xue and Lai concerning compensation and Xue's threat to resign if the discussions were not resolved in his favor. (Amended Compl. ¶ 28.) Plaintiff further alleges that "[a]mong other things, Defendant Xue was demanding a substantial multi-million dollar payment and substantial stock compensation for himself and certain of his associates." (Amended Compl. ¶ 28.) Plaintiff also alleges that "Defendant Xue and Defendant Lai were negotiating a proposed transaction between Defendant Xue and BCL which would result in Defendant Xue and others associated with

-6-

him receiving substantial compensation." (Amended Compl. ¶ 28.) Plaintiff continues that because of Xue's importance to Agria, those negotiations presented a substantial risk, which "would have been viewed by investors as substantially altering the total mix of information. . . ." (Amended Compl. ¶ 28.)

Plaintiff contends that because of this failure "[t]he Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading and was not prepared in accordance with the rules and regulations governing its preparation." (Amended Compl. ¶ 27.) Specifically, Plaintiff alleges that the statements describing Agria's corporate structure (Amended Compl. ¶ 29), the description of Agria's business (Amended Compl. ¶ 30), the "Risks and Challenges" facing Agria (Amended Compl. ¶ 31), statements that Agria had "effective control" over P3A (Amended Compl. ¶ 32), and the warnings regarding what effect the loss of a manager would have (Amended Compl. ¶ 33) were inaccurate statements of material fact because they failed to disclose the existing negotiations between Lai and Xue. (Amended Compl. ¶ 34.) Moreover, Plaintiff alleges that sections in the Registration Statement titled "Our Contractual Arrangement with P3A and Its Shareholders" and "Related Party Transactions" and warnings regarding the risks presented if a P3A shareholder breached his or her agreements with Agria all failed to disclose the negotiations as well. (Amended Compl. ¶¶ 35-37.) Plaintiffs contend that "[u]nder applicable SEC rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to disclose the negotiations between Defendant Xue and Defendant Lai." (Amended Compl. ¶ 38.)

DISCUSSION

I. Sections 11 & 12(a)(2)

Sections 11 and 12(a)(2) of the 1933 Act "create liability for material misstatements or omissions in connection with the initial sale and distribution of securities." In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009). "Section 11 deals with registration statements, while section 12 covers prospectuses." In re Fuwei Films, 634 F. Supp. 2d at 434 (citing 15 U.S.C. §§ 77k(a); 77l(a)(2)). Section 11 allows purchasers of a registered security to sue, inter alia, any signer of a registration statement and any director of the issuer, if a registration statement contains an untrue statement of a material fact or omits a material fact necessary to make the statement therein not misleading. See Rubin v. MF Global Ltd., 634 F. Supp. 2d 459, 466 (S.D.N.Y. 2009). "Section 12(a)(2) imposes liability for selling or offering a security by means of prospectus that includes an untrue statement of material fact or omits a material fact necessary to make such statements not misleading." Rubin, 634 F. Supp. 2d at 466. "A plaintiff who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2) claim as well." Rubin, 634 F. Supp. 2d at 466 n.3 (citing Lin v. Interactive Brokers Group, Inc., 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008)).

A successful section 11 claim requires that: (1) the defendant have an affirmative duty to disclose the information but fails to do so, and (2) the untrue or omitted information was material. See Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d 220, 227 (S.D.N.Y. 1999). "The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective." In re Flag Telecom Holdings Ltd. Sec. Litig., 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004) (citing In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 923 (D.N.J. 1998)).

A.  Rule 9(b)

While neither Section 11 nor Section 12(a)(2) require a plaintiff to allege the scienter or reliance elements of a fraud cause of action, see Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004), the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims "insofar as the claims are premised on allegations of fraud," Rombach, 355 F.3d at 171. "So while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." Rombach, 355 F.3d at 171.

Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." Rombach, 355 F.3d at 171. Accordingly, "a complaint may sound in fraud even where . . . no fraud claims under [section 10(b) of] the Exchange Act are asserted." Ladmen Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008).

"Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient" to avoid Rule 9(b) standards when Securities Act claims sound in fraud. In re Axis Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006). However, here there are no allegations in the Amended Complaint sounding in fraud. See In re Charles Schwab Corp. Sec. Litig., 257 F.R.D. 534, 545 (N.D. Cal. 2009) (finding use of the word "misrepresented" insufficient for Rule 9(b) to be applicable). Accordingly, this Court will not apply the heightened Rule 9(b) pleading standard to review the Amended Complaint.

B. The Adequacy of the Factual Allegations

"[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement." Iqbal, 129 S. Ct. at 1949 (quotation marks omitted).

On a motion to dismiss, the Court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556. Nonetheless, "factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Twombly, 550 U.S. at 556.

This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. Thus, a plaintiff must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [his claim]." Twombly, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct at 1949 (citation omitted). "'Determining

whether a complaint states a plausible claim for relief will . . . be a context specific task that requires the reviewing court to draw on its judicial experience and common sense.'" South Cherry Street LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1953). A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

Plaintiff's Section 11 and 12(a)(2) claims stem from the April 2008 Press Release disclosure that Lai approached the Board in late-January 2008 with a Proposed Transaction to pay Xue and other members of P3A's management $18 million and a 22% stake in Agria in order to retain them. From this disclosure, Plaintiff infers that at the time the Registration Statement and Prospectus were issued, negotiations were underway between Xue and Lai regarding compensation for Xue and the P3A management team.

In Cooperman v. Individual, Inc., 171 F.3d 43 (1st Cir. 1999), the First Circuit found that a July 1996 announcement of "the departure of the president, CEO and founder of the Company—just four and one-half months after the IPO" supported an inference that the conflict that drove the founder from the company existed as early as the IPO in March 1996. Cooperman, 171 F.3d at 48. In reaching this conclusion, the court in Cooperman noted that "experience indicates . . . that Board-level conflicts like the one that existed [when the CEO finally resigned] do not arise or disappear overnight." Cooperman, 171 F.3d at 48 (internal citation and quotation marks omitted).

While this Court agrees that conflicts like the one alleged in the Amended Complaint

do not arise or disappear overnight, Cooperman was decided before Twombly and Iqbal, under the standard set out in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), permitting district courts to dismiss a complaint only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46. This "no set of facts" standard was "designed to screen out only those cases that patently had no theoretical hope of success." Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629 (6th Cir. 2009). The Iqbal standard "screens out the 'little green men' cases just as Conley did" as well as "cases that, while not utterly impossible, are 'implausible.'" Courie, 577 F.3d at 629-30 (citing Robert G. Bone, Twombly, Pleading Rules, and the Regulation of Court Access, 94 IOWA L. REV. 873, 887-90 (2009)). However, courts have yet to define "exactly how implausible is 'implausible'" because "such a malleable standard will have to be worked out in practice." Courie, 577 F.3d at 629.

      The Second Circuit has not addressed Iqbal. However, other Circuits have weighed in on Iqbal and described the standard as requiring that a complaint "do more than allege the plaintiff's entitlement to relief . . . [it] has to 'show' such an entitlement with its facts." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009); see also Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (noting that courts must draw "reasonable inferences in Plaintiff's favor, but . . . are not required to draw Plaintiff's inferences", refuse to take as true "unwarranted deductions of fact" and require that allegations be "plausible on [their] face"). Still other Courts of Appeals have read Iqbal to "admonish[] those plaintiffs who merely parrot the statutory language of the claims that they are pleading . . . rather than providing some specific facts to ground those legal claims. . . ." Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009) (noting that while factual allegations must be accepted as true "some factual allegations will be so sketchy or implausible that

they fail to provide sufficient notice to defendants of the plaintiff's claim"); see also Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (noting "bare assertions" are not to be "discounted because they are 'unrealistic or nonsensical,' but rather because they do nothing more than state a legal conclusion . . ." and the "non-conclusory factual content and reasonable inferences from that content must be plausibly suggestive of a claim entitling the plaintiff to relief").

Under any understanding of Iqbal and Twombly, Plaintiff's factual allegations are adequate to support an inference that discussions took place concerning Xue's compensation in November 2007. It is plausible and not "sketchy" that some preliminary discussions about compensation took place three months before the Chair of Agria approached the Board with the proposed compensation package. In addition, the magnitude of the Proposed Transaction, the Chair's presentation of it as a package ready for the Board's approval, and Xue's own statements that he had complained to the Board "many times" in the past support the inference that the parties had been discussing the Proposed Transaction before it was presented to the Board. It is also plausible that if such negotiations were going on, "Xue was threatening to resign as Chief Operating Officer at Agria if these discussions were not resolved in his favor," and that negotiations presented "a significant risk to Agria's operations and financial conditions."

Accordingly, this Court finds the factual allegations in the Amended Complaint sufficient, but not a violation of the securities laws.

C. Duty to Disclose

"To state a claim under Sections 11 and 12(a)(2), a plaintiff must allege that defendants had a legal obligation to disclose the allegedly omitted information." Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008) (citing Geiger v. Solomon-Page Group,

-13-

Ltd., 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996)). "The content of the duty depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder." Rubin, 634 F. Supp. 2d at 474 (quotation marks omitted). "[T]he mere possession of material nonpublic information does not create a duty to disclose it." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996), superceded by statute on other grounds, 15 U.S.C. § 78u-4(b)(1)-(2). "A defendant is not required to disclose all known information, but has a duty to disclose any information that is necessary to make other statements not misleading." In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003); see also Cooperman, 171 F.3d at 49 ("[I]t is clear that an issuer of securities owes no absolute duty to disclose all information. The issue, rather, is whether the securities law imposes on defendants a 'specific obligation' to disclose information of the type that plaintiffs claim was omitted," such as the statutory requirement that the prospectus not omit a material fact "necessary to make the statements therein not misleading.").

Plaintiffs cite no specific regulation but argue that the omitted facts were necessary so as to not render the Registration Statement and Prospectus "misleading." However, read in context, the failure to disclose negotiations about compensation does not render the Prospectus misleading. Here, the Prospectus clearly discloses the importance of the relationship among P3A, Agria, and its officers and the consequences that could flow from an officer's departure. Moreover, the Prospectus does not downplay the possibility of negotiations about compensation or paint too rosy a picture about P3A management. Nor does the existence of negotiations about compensation undercut the assertion that the agreements with P3A and its shareholders gave Agria "effective control" over P3A. Xue and the P3A managers involved in the preliminary discussions controlled

only 30% of P3A's stock. Thus, the failure to disclose preliminary discussions between Xue and Lai concerning compensation does not render statements about "effective control" false or misleading. See Cooperman, 171 F.3d at 50-51 (finding no duty to disclose Board-level conflict that led to CEO and founder's resignation because prospectus was complete and accurate).

Moreover, there is no general duty to disclose internal problems merely because those problems might become significant. See In re N. Telecom Sec. Litig., 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) (no duty to disclose software and customer problems because "[a] company is generally not obligated to disclose internal problems because the securities laws do not require management to bury the shareholders in internal details" (modifications and quotation marks omitted)); Taylor v. First Union Corp. of S.C., 857 F.2d 240, 246 (4th Cir. 1988) (noting "[f]ederal securities law was not intended to provide a federal forum for every intra-corporate squabble" and finding no need to disclose preliminary discussions where relationship was of a "fickle and changeable nature"); see also Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992) (noting "the mere fact that exploration of a merger or LBO possibilities may have reached a stage where that information may be considered material does not, of itself, mean that companies have a duty of disclosure").

Informal compensation negotiations are a common occurrence in corporate life. To impose a duty to disclose every preliminary discussion with officers about compensation would be unreasonable. Agria was not obligated to disclose negotiations between Xue and Lai in November 2007 months before the Proposed Transaction was presented to the Board. Of course, the landscape changed when Lai presented the Proposed Transaction to the Board for its consideration. But that conduct is not at issue in this lawsuit. Because there was no obligation to disclose mere

negotiations regarding compensation occurring at the time of the IPO, Agria did not violate Sections 11 or 12(a)(2). Accordingly, Defendants' motion to dismiss the Sections 11 and 12(a)(2) claims is granted.

II. Section 15 Claims

Section 15 of the 1933 Act provides for control person liability for violations of Sections 11 or 12 of the 1933 Act. See Rubin, 634 F. Supp. 2d at 474 (citing 15 U.S.C. § 77o). Claims under Section 15 "depend upon an adequate pleading by Plaintiffs with respect to §§ 11 and 12(a)(2)." Miller v. Lazard, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (citing In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003)). Because this Court is dismissing the Sections 11 and 12(a)(2) claims, the Section 15 claims against Agria and the Underwriter Defendants are also dismissed.

CONCLUSION

For the foregoing reasons, the motion of Defendants Agria Corporation, Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., Piper Jaffray & Co., and CIBC World Markets Corp. to dismiss the First Amended Consolidated Class Action Complaint against them is granted.

Dated: November 30, 2009
       New York, New York

                                        SO ORDERED:

                                        _____
                                        WILLIAM H. PAULEY III
                                        U.S.D.J.

*Counsel of Record:*

David A. Rosenfeld, Esq.
Coughlin Stoia Geller Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, NY 11747
*Lead Counsel – In re Agria Corp. Securities Litigation*

James Farrell, Esq.
Latham & Watkins, LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
*Counsel for Agria Corporation and the Individual Defendants*

A. Hyun Rich, Esq.
Linklaters
1345 Avenue of the Americas, 19th Floor
New York, NY 10105
*Counsel for Credit Suisse Securities (USA) LLC,*
*HSBC Securities (USA), Inc., Piper Jaffray & Co., and*
*CIBC World Markets Corp.*