UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

In re AGRIA CORPORATION SECURITIES      :  Civil Action No. 1:08-cv-03536-WHP
LITIGATION                               :
                                         :  CLASS ACTION
——————————————————————   :
                                         :
This Document Relates To:                :  LEAD PLAINTIFF'S MEMORANDUM OF
                                         :  LAW IN OPPOSITION TO THE
     ALL ACTIONS.                        :  INDIVIDUAL DEFENDANTS' MOTION TO
                                         :  DISMISS
——————————————————————  x

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL ALLEGATIONS.................................................................................3

III.  RELEVANT PROCEDURAL HISTORY ............................................................3

IV.   ARGUMENT ........................................................................................................5

    A.    The Legal Standard Governing a Motion to Dismiss ..............................5

    B.    The Legal Standard Governing Sections 11 and 12(a)(2).......................6

    C.    The SCAC Adequately Alleges that Defendants Had a Duty to Disclose
        Xue's Compensation Negotiations and Resignation Threats in the
        Registration Statement ..............................................................................6

    D.    The SCAC Adequately Alleges an Actionable Omission.......................18

    E.    The SCAC Adequately Alleges that Defendants Violated Section 12(a)(2).........20

    F.    Plaintiff Timely Served the CAC or Can Establish an Entitlement to
        Excusal from Imperfect Service .............................................................22

V.    CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

Page

CASES

*Ark. Pub. Employee Retirement Sys. v. GT Solar Int'l, Inc.*,
  No. 08-cv-312-JL, 2009 U.S. Dist. LEXIS 93820
  (D.N.H. Oct. 7, 2009) ......................................................................................................... 14

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ........................................................................................................... 5

*Basic, Inc. v. Levinson*,
  485 U.S. 224, 237 (1988) ..................................................................................................... 16

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................ 5

*Briarwood Invs. Inc. v. Care Inv. Trust Inc.*,
  No. 07 Civ. 8159 (LLS), 2009 U.S. Dist. LEXIS 18963
  (S.D.N.Y. Mar. 4, 2009) .................................................................................................. 21, 22

*Bunim v. City of New York*,
  Case No. 05-CV-1562 (KMK), 2006 U.S. Dist. LEXIS 50309
  (S.D.N.Y. July 24, 2006) ..................................................................................................... 24

*Burch v. Pioneer Credit Recovery, Inc.*,
  551 F.3d 122 (2d Cir. 2008) ................................................................................................... 5

*Chrobak v. Hilton Group PLC*,
  06 Civ. 1916 (MGC), 2007 U.S. Dist. LEXIS 59646
  (S.D.N.Y. Aug. 16, 2007) .................................................................................................... 23

*Degulis v. LXR Biotechnology, Inc.*,
  928 F. Supp. 1301 (S.D.N.Y. 1996) .................................................................................... 21

*Durgin v. Mon*,
  659 F. Supp. 2d 1240 (S.D. Fla. 2009) ............................................................................... 23

*Feiner v. SS&C Techs., Inc.*,
  11 F. Supp. 2d 204 (D. Conn. 1998) ................................................................................... 10

*Glassman v. Computervision Corp.*,
  90 F. 3d 617 (1st Cir. 1996) ................................................................................................. 13

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ................................................................................................. 18

**Page**

*In re Adams Golf, Inc., Sec. Litig.*,
    618 F. Supp. 2d 343 (D. Del. 2009) ................................................................10

*In re Agria Corp. Sec. Litig.*,
    No. 08 Civ. 3536 (WHP), 2009 U.S. Dist. LEXIS 110914
    (S.D.N.Y. Nov. 30, 2009) ....................................................................*passim*

*In re APAC Teleservices, Inc. Sec. Litig.*,
    No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
    (S.D.N.Y. Nov. 19, 1999) ...................................................................21

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996) ...................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) ................................................21

*In re Humana Inc. Sec. Litig.*,
    No. 3:99-CV-0398-S, 2000 U.S. Dist. LEXIS 21671
    (W.D. Ky. Nov. 7, 2000) ............................................................. 14, 15

*In re Initial Pub. Offering*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2004) ..................................... 7, 10, 17

*In re Quintel Entertainment Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 1999) ..................................................17

*In re Sofamar Danek Group*, Inc.,
    123 F.3d 394, 402 (6th Cir. 1997) ......................................................14

*In re Sunbeam Sec. Litig.*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) .................................................22

*In re Surebeam Corp. Sec. Litig.*,
    No. 03 CV 1721 JM (FOR), 2004 U.S. Dist. LEXIS 26951
    (S.D. Cal. Dec. 30, 2004) ...................................................................11

*In re Verifone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ...................................................14

*In re WorldSpace Sec. Litig.*,
    No. 07 Civ. 2252 (RMB), 2008 WL 2856519
    (S.D.N.Y. July 21, 2008) ......................................................................6

- iii -

**Page**

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
   07 Civ. 0976 (LAP), 2008 U.S. Dist. LEXIS 76670
   (S.D.N.Y. Sept. 30, 2008) ........................................................................... 24

*Lin v. Interactive Brokers Group, Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008) ........................................................ 6, 19

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999) ............................................................. 11

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) .................................................................... 16, 17

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) .......................................................................... 19

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ............................................................................. 20, 22

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ...................................................................... 6, 18

*Sciotti v. St.-Gobain Containers, Inc.*,
   06-CV-6422 CJS, 2008 U.S. Dist. LEXIS 40382
   (W.D.N.Y. May 19, 2008) ............................................................................ 25

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ...................................................................... 7, 13

*Shider v. Communications Workers of America*,
   No. 95 Civ. 4908, 1999 U.S. Dist. LEXIS 13184
   (S.D.N.Y. Aug. 30, 1999) ........................................................................ 23, 24

*Simon v. Am. Power Conversion Corp.*,
   945 F. Supp. 416 (D.R.I. 1996) .................................................................... 11

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) .................................................................... 8, 17

*Steed Finance LDC v. Nomura Sec. Int'l, Inc.*,
   No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761
   (S.D.N.Y. Sept. 20, 2001) ........................................................................... 21

Page

*Tishman v. AP*,
05 Civ. 4278 (GEL), 2005 U.S. Dist. LEXIS 34356
(S.D.N.Y. Dec. 16, 2005) ...........................................................................................25

*Zapata v. City of New York*,
502 F.3d 192 (2d Cir. 2007) ......................................................................................24

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§77k(a).............................................................................................................................6
§77l(a)(2) .......................................................................................................................6

Federal Rules of Civil Procedure
Rule 4(m) ............................................................................... 22, 23, 24, 25
Rule 8(a) ........................................................................................................................4
Rule 8(a)(2)...................................................................................................................5
Rule 10-b5 ..................................................................................................................16
Rule 12(b)(6)................................................................................................................5

17 C.F.R.
§229.303 ............................................................................................................... 1, 12
§229.303(a) .................................................................................................................12

## STATUTES, RULES AND REGULATIONS

*Mgmt.'s Discussion and Analysis of Fin. Condition and
Results of Operations*; *Certain Inv. Co. Disclosures*,
SEC Release No. 6835, 1989 WL 1092885
(May 18, 1989) ........................................................................................................8, 9

*Disclosures in MD&A About Off-Balance Sheet Arrangements and Aggregate
Contractual Obligations*,
SEC Release No. 8182, 2003 WL 175446
(Jan. 28, 2003) ...........................................................................................................12

Lead plaintiff Nijat Tonyaz ("Lead Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss the Second Consolidated Amended Complaint ("SCAC," cited to as "¶__") ("Def. Mem. at __") filed by defendants Terry McCarthy ("McCarthy") and Geoffrey Duyk ("Duyk") (collectively, "Defendants").

## I.    INTRODUCTION

Plaintiff's factual allegations, as detailed in the Consolidated Amended Complaint ("CAC") and expounded upon in the SCAC, have already been found by this Court to be sufficient. *See In re Agria Corp. Sec. Litig.*, No. 08 Civ. 3536 (WHP), 2009 U.S. Dist. LEXIS 110914, at *21 (S.D.N.Y. Nov. 30, 2009) (the "Order"). Specifically, at the time of Agria Corporation ("Agria")'s initial public offering ("IPO"), Zhixin Xue ("Xue"), the key executive who forged Agria's link to Primalights III Agriculture Development Co. Ltd. ("P3A") – the company through which Agria was able to maintain its operations in China – was negotiating for additional compensation and threatening to resign if his demands were not met. In the words of the Court, these negotiations "presented 'a significant risk to Agria's operations and financial conditions.'" *Id.* at *21.

Despite agreeing with the sufficiency of Plaintiff's factual allegations, the Court nevertheless granted the motion to dismiss the Consolidated Amended Complaint ("CAC") that was filed by Agria and the Underwriter Defendants. While the basis for the Court's dismissal of the CAC was that Plaintiff had "cite[d] no specific regulation" dictating Defendants' duty to disclose (and therefore no duty to disclose existed), *Agria*, 2009 U.S. Dist. LEXIS 110914, at *22, the SCAC remedies this deficiency by identifying the specific Securities and Exchange Commission ("SEC") rules and regulations that imposed a duty on Defendants to disclose Xue's compensation negotiations and threats to resign in the Registration Statement: Item 5(D) of Part I of Form 20-F ("Item 5(D)"), and Item 303 of Regulation S-K [17 C.F.R. §229.303] ("Item 303"), both of which require a registrant to disclose any events or uncertainties reasonably likely to have a material effect

on, among other things, a company's revenues, income from operations, or profitability. *See* ¶¶34-40. Xue's compensation demands and his threats to resign – which the Registration Statement concedes were material – were reasonably likely to have precisely such an effect on Agria. *See* ¶29.

Indeed, with the supplemental allegations of the SCAC, Plaintiff is now able to explain why the Court's holding that there is no "duty to disclose every preliminary discussion with officers about compensation," *Agria*, 2009 U.S. Dist. LEXIS 110914, at *24, and thus "no obligation to disclose mere negotiations regarding compensation occurring at the time of the IPO," *id*. at *25, is not applicable here. Given Xue's importance to Agria's business, the outcome of these undisclosed negotiations presented a significant ***risk*** to the Company's operations and financial position. The fact that Agria ultimately acceded to Xue's compensation demands after he tendered his resignation (paying out a total of $18 million in cash, transferring shares representing 22% ownership of Agria, and causing Agria to report a quarterly loss as the result of this payment), underscores just how essential Xue was to Agria's business. ¶¶24, 30, 42-47.

Because Items 5(D) and 303 require disclosure of events or uncertainties reasonably likely to have a material effect on a company's revenues, income from operations or profitability – and this Court has already held that these negotiations "presented 'a significant risk to Agria's operations and financial conditions," *Agria*, 2009 U.S. Dist. LEXIS 110914, at *21, – the Xue negotiations cannot be considered "mere negotiations." *Id.* at *25. They are also unlike typical demands made by "successful executives" who "routinely . . . make informal inquiries, efforts or threats," Def. Mem. at 20, which Plaintiff concedes would not require disclosure. Rather, because of the duty to disclose created by Items 5(D) and 303 under these particular facts, the Xue negotiations were required to be disclosed in the Registration Statement and Defendants' failure to make such disclosure is actionable.

Despite these straightforward allegations, Defendants dispute that any disclosure obligation existed under Items 5(D) and 303. Instead, they urge an overly-narrow interpretation of Items 5(D) and 303, arguing that these provisions only apply to "hard" data such as line-items of financial statements, and cannot be applied to negotiations about executive compensation. This argument, however, misses the mark because the negotiations over Xue's compensation were reasonably likely to – and did – have a material effect on Agria's financial condition, including its revenues and profitability. And, as the very terms of Items 5(D) and 303 make clear, it is the effect, and not the nature, of an event or uncertainty that is dispositive. Thus, the Court's concerns in the Order have been adequately addressed.

The balance of Defendants' arguments, as discussed herein, are similarly without merit. Accordingly, for these reasons, and as set forth below in further detail, Defendants' motion to dismiss should be denied in its entirety.

## II.    FACTUAL ALLEGATIONS

The facts alleged in this action were already set forth at length in Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, dated April 29, 2009 (Docket No. 36), and in the Court's November 30, 2009 Order, *Agria*, 2009 U.S. Dist. LEXIS 110914, at *1-*12. To avoid unnecessary repetition, Plaintiff respectfully refers the Court to the factual allegations set forth in its prior memorandum of law (which is incorporated herein in its entirety by reference) and in the Court's Order. *See id.*

## III.    RELEVANT PROCEDURAL HISTORY

On November 30, 2009, this Court granted the motion to dismiss the CAC filed by Agria and

- 3 -

the Underwriter Defendants (Docket No. 44).[1]  The Court held, *inter alia*, that the allegations in the

CAC did not sound in fraud, and analyzing the allegations under Fed. R. Civ. P. 8(a), concluded that

"Plaintiff's factual allegations [were] adequate to support an inference that discussions took place

concerning Xue's compensation in November 2007," *i.e.*, before the IPO.  *Agria*, 2009 U.S. Dist.

LEXIS 110914, at *20.  The Court reasoned that "conflicts like the one alleged in the Amended

Complaint do not arise or disappear overnight," *id*. at *18, and found that it was "plausible . . . that

some preliminary discussions about compensation" had taken place by the time of the November

2007 IPO, and it was "also plausible that if such negotiations were going on, 'Xue was threatening to

resign as Chief Operating Officer at Agria if these discussions were not resolved in his favor. . . .'"

*Id*. at *20-*21.  The Court also expressed its view that the negotiations with Xue "presented 'a

***significant risk to Agria's operations and financial conditions***.'"  *Id*. at *21.[2]  While the Court held

that the factual allegations in the CAC were sufficiently pled, *id*., the Court nevertheless dismissed

the CAC, noting that "Plaintiff[] [had] cite[d] no specific regulation" that created a duty of

disclosure in the Registration Statement of Xue's compensation negotiations and resignation threats.

*Id*. at *22-*25.

On December 14, 2009, Plaintiff moved for reconsideration of the Order, or, in the

alternative, for leave to file a Proposed Second Consolidated Amended Complaint, which Plaintiff

respectfully submitted would remedy the deficiencies identified by the Court in the Order.  Docket

Nos. 48-49, 53.  That motion is currently pending before the Court.

---

1    Although Defendants had not moved to dismiss at the time the Order was issued, the Court
noted that the "Order applies with equal force to the claims asserted against the Individual
Defendants."  *Agria*, 2009 U.S. Dist. LEXIS 110914, at *2 n.1.  As detailed herein, the SCAC,
contains additional allegations that directly respond to the Court's concerns in the Order.

2    Unless otherwise noted, emphasis is added and citations are omitted.

Following a status conference on December 18, 2009, at which the Court indicated that the SCAC would become the operative pleading with respect to Defendants McCarthy and Duyk, and in accordance with the Order entered on December 22, 2009, Plaintiff filed the SCAC on December 28, 2009. Docket Nos. 50-51. Defendants McCarthy and Duyk have now moved to dismiss the SCAC. Docket Nos. 56-58.

## IV.    ARGUMENT

### A.    The Legal Standard Governing a Motion to Dismiss

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe the complaint liberally, accept all factual allegations as true, and draw all reasonable inferences in plaintiff's favor. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008). Where, as here, a complaint's allegations do not sound in fraud, those allegations are only subject to the notice pleading standards of Rule 8(a)(2). *See Agria*, 2009 U.S. Dist. LEXIS 110914, at *15.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). Factual allegations must only be "enough to raise a right to relief above the speculative level. . . ." *Twombly*, 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,'" and is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "'Determining whether a complaint states a plausible claim for relief will . . . be a context specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Agria*, 2009 U.S. Dist. LEXIS 110914, at *16-*17.

### B.    The Legal Standard Governing Sections 11 and 12(a)(2)

Section 11 of the Securities Act imposes liability on, *inter alia*, the issuer of a security, as well as any person who signed the registration statement and/or served as a director of the issuer or performed similar functions, if:  the registration statement as of its effective date contained an untrue statement of a material fact; omitted to state a required material fact; or omitted to state a material fact necessary to make the statements therein not misleading.  *See* 15 U.S.C. §77k(a); *see also Rombach v. Chang*, 355 F.3d 164, 168 n.2 (2d Cir. 2004).  Similarly, Section 12(a)(2) holds any person liable who "offers or sells a security" by means of a materially false "prospectus or oral communication."  15 U.S.C. §77l(a)(2); *see also Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008).

"A successful section 11 claim requires that: (1) the defendant have an affirmative duty to disclose the information but fails to do so, and (2) the untrue or omitted information was material."  *Agria*, 2009 U.S. Dist. LEXIS 110914, at *13.  "To establish a claim under Section 12(a)(2), 'a plaintiff must prove that (1) defendants sold or offered a security (2) by means of a prospectus (3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not misleading.'"  *In re WorldSpace Sec. Litig.*, No. 07 Civ. 2252 (RMB), 2008 WL 2856519, at *5 (S.D.N.Y. July 21, 2008).  Neither Section 11 nor Section 12 requires pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made.  *See Rombach*, 355 F.3d at 169 n.4.

### C.    The SCAC Adequately Alleges that Defendants Had a Duty to Disclose Xue's Compensation Negotiations and Resignation Threats in the Registration Statement

As this Court correctly noted, "'[t]o state a claim under Sections 11 and 12(a)(2), a plaintiff must allege that defendants had a legal obligation to disclose the allegedly omitted information.'"  *Agria*, 2009 U.S. Dist. LEXIS 110914, at *21.  "'***The content of the duty depends largely on the***

*itemized disclosures required by the securities laws and the regulations promulgated thereunder*.'"
*Id.* at *21-*22.

  While the basis for the Court's dismissal of the CAC was that Plaintiff had "cite[d] no specific regulation" dictating Defendants' duty to disclose, *Agria*, 2009 U.S. Dist. LEXIS 110914, at *22, the SCAC remedies this deficiency by identifying the specific SEC rules and regulations that imposed a duty on Defendants to disclose Xue's compensation negotiations and threats to resign in the Registration Statement. *See* ¶¶34-40.  Specifically, under Item 5(D),[3] Agria was required to disclose "any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operation results or financial condition." ¶35. Item 303(a) of Regulation S-K contains nearly identical disclosure requirements, which mandate the disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." ¶37 (quoting Item 303(a)(3)(ii)).

  It is undisputed that the regulations governing the preparation of a registration statement require the disclosure of certain information in a registration statement and that the failure to do so is a violation of Section 11. *See, e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1203-04 (1st Cir. 1996). It is also well-established that failure to comply with Item 303 creates liability under Section 11. *See In re Initial Pub. Offering*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) ("An omission of fact 'required to be stated' under Item 303 will generally produce liability under Section 11"); *see also*

---

3  Pursuant to Item 4(a) of Form F-1, the Registration Statement was required to furnish the information required by Part I of Form 20-F.  ¶35.

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (holding that liability exists if a registrant "'omits to state a material fact required to be stated'" in a registration statement and "any omission of facts 'required to be stated' under Item 303 will produce liability").

Defendants therefore focus their argument on whether, under Items 5(D) and 303, they were obligated to disclose Xue's compensation negotiations and resignation threats in the Registration Statement. Under the language of Item 5(D), the analysis is straightforward: if the non-disclosed information is an "uncertaint[y] . . . that [is] reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources . . . ," then the information was required to be disclosed in the Registration Statement. Item 5(D).

The SEC has provided guidance for evaluating the analogous disclosure requirements under Item 303. *See Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations* ("MD&A"); *Certain Inv. Co. Disclosures*, SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (the "1989 Interpretive Release"). In the 1989 Interpretive Release, the SEC stated that, "[a] disclosure duty exists where a trend, demand, commitment, event or uncertainty is both *presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.*" *Id.* at *4; ¶38. Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> [W]here a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*Id.* at *6; ¶39.  Importantly, where the test for disclosure is met, "disclosure of the effects [of the uncertainty,] quantified to the extent reasonably practicable, [is] required."  *Id.*

The Court has already found that Plaintiff's allegations readily satisfy the test set out in the 1989 Interpretive Release: (i) the uncertainty associated with Xue was known to management by the time of the IPO ("Plaintiff's factual allegations [were] adequate to support an inference that discussions took place concerning Xue's compensation in November 2007" – *i.e.*, prior to the IPO, and that "'Xue was threatening to resign . . . if these discussions were not resolved in his favor,'" *Agria*, 2009 U.S. Dist. LEXIS 110914, at *21); and (ii) this uncertainty was reasonably likely to have a material effect on Agria's financial condition or results of operation (*id.* (stating that the negotiations with Xue "presented 'a **significant risk to Agria's operations and financial conditions**.'")).

At the time of the IPO, both the compensation negotiations and Xue's threats to resign were known uncertainties that were reasonably likely to have a material effect on Agria – including its business and relationship with P3A.  *See* ¶¶36, 42-50.[4]  In fact, these events were reasonably likely to have two possible adverse and material outcomes, both of which required disclosure:  If Agria's Board decided to meet Xue's demands and pay out the $18 million in cash and the transfer of shares representing 22% ownership of Agria that Xue was seeking, then the Company would have to record the payout as an earnings charge, which would have a material adverse effect on its revenues,

---

[4]    Defendants attempt to paint Xue's demands for additional compensation and threats to resign as mere future possibilities, as opposed to objective facts, by repeatedly mischaracterizing them as "'preliminary discussions' . . . about the need for future compensation negotiations." Def. Mem. at 6, 15; *see also id.* at 2, 3, 10, 11, 13, 15, 16-17, 21.  The Court already held, however, that it was plausible that the compensation negotiations were taking place, and that Xue was threatening to resign, prior to the IPO.  *See Agria*, 2009 U.S. Dist. LEXIS 110914, at *20-*21.  It is not the potential need for future negotiations that is at issue here, but rather the existence of those negotiations, and of Xue's threats to resign, at the time of the IPO.

income and profitability. *See* ¶¶24, 30, 42-47. On the other hand, if Agria's Board refused Xue's demands, and he permanently resigned from his position as Agria's Chief Operating Officer ("COO"), the consequences would be even more dire. Agria would lose the key individual who provided the link that it needed to effectively control P3A, which held the necessary licenses and permits to produce and sell seed products in China and which accounted for the majority of Agria's revenues. ¶¶19, 24, 25, 28. That event that would certainly be likely to have "a material effect on the [C]ompany's . . . revenues, income from continuing operations, [and] profitability." Item 5(D).[5] Of course, the compensation negotiations, together with Xue's resignation, ultimately ***did*** have a material effect on Agria's revenues and income, resulting in a net loss of $8.3 million in the first quarter of 2008, "***primarily due to the [$9.2 million] settlement between our shareholder, Brothers Capital Limited, and management of P3A.***" ¶50.

Thus, pursuant to Items 5(D) and 303 – and consistent with the test set forth in the 1989 Interpretive Release – disclosure of Xue's compensation negotiations and resignation threats was required in the Registration Statement. *See, e.g.*, *Initial Pub. Offering*, 358 F. Supp. 2d at 211 (upholding Plaintiff's claim under section 11 where Item 303 might have required disclosure of a downward trend in advertising rates since such a trend "could significantly and adversely impact the results of operations"); *see also In re Adams Golf, Inc., Sec. Litig.*, 618 F. Supp. 2d 343, 349 (D. Del. 2009) (holding that defendants had a duty under Item 303 to disclose the risk of gray marketing in the registration statement because it was "a known trend or uncertainty likely to have a material

---

5    While it is true that "there is no general duty to disclose internal problems merely because those problems might become significant," *Agria*, 2009 U.S. Dist. LEXIS 110914, at *23, there is an unequivocal duty to disclose "events that are reasonably likely to have a material effect" on a company's business, regardless of whether such events have transpired. *See* Item 5(D); Item 303(a); *see also Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998) ("The fact that actual results may suggest that the undisclosed or misstated risk was not realized does not in turn yield the conclusion that the risk was immaterial as a matter of law.").

impact on [the company's] future revenue"); *In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721 JM

(FOR), 2004 U.S. Dist. LEXIS 26951, at *39-*40 (S.D. Cal. Dec. 30, 2004) (sustaining Section 11

claim on omission of information required under Item 303 concerning joint venture and funding);

*Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999) (allegation that products

were not gaining market acceptance stated claim that registration statement omitted material

information required to be stated therein under Item 303); *Simon v. Am. Power Conversion Corp.*,

945 F. Supp. 416, 431 (D.R.I. 1996) (holding that Item 303 required disclosure of product defect

because it was a "'known uncertainty'" that was reasonably expected to impact costs and revenues).

Defendants do not contest that these events were reasonably likely to, and did, have a

material effect on Agria. Instead, they try to downplay the relevance of Items 5(D) and 303 by

arguing that they only require disclosure of "hard" financial information, such as "mandated line

items of . . . financial statements . . . relating to the company's liquidity, revenue, *etc.*" Def. Mem. at

16; *see also id.* at 3, 13-15; 17-18. This argument, however, demonstrates exactly why the

negotiations with Xue were not typical management negotiations about executive compensation.

As a general matter, conceding to management demands for additional compensation (amid

threats of resignation) does not result in a company reporting a quarterly loss. Here, however, Agria

reported a financial loss of $8.3 million in the first quarter of 2008, "***primarily due to the [$9.2***

***million] settlement between our shareholder, Brothers Capital Limited, and management of P3A.***"

¶50. Thus, this was clearly unlike demands made by "successful executives" who "routinely . . .

make informal inquiries, efforts or even threats," Def. Mem. at 20, and was required to be disclosed.

Indeed, given Xue's importance to Agria's business, the outcome of these undisclosed

negotiations presented a significant ***risk*** to the Company's operations and financial position. The

fact that Agria ultimately acceded to Xue's compensation demands after he tendered his resignation

- 11 -

(paying out a total of $18 million in cash and transferring shares representing 22% ownership of Agria), underscores just how essential Xue was to Agria's business. ¶¶24, 30, 42-47. These events clearly were not the "routine . . . internal corporate discussions" that Defendants seek to portray them as. Def. Mem. at 3; *see also id*. at 20-21.[6]

Defendants' reading of Items 5(D) and 303 is also much too narrow, and contravenes the very purpose of those disclosure requirements, which is to ensure that a registration statement provides investors with the information necessary to make an informed investment decision. *See, e.g.*, 1989 Interpretive Release at *17 (noting that "*[t]he MD&A requirements are intentionally flexible and general*"); *see also* 17 C.F.R. 229.303 (providing, in Instruction 3 to Item 303(a), that disclosure should include matters that would have an impact on future operations but have not in the past, and *vice versa*); 17 C.F.R. 229.303(a) (requiring disclosure of "*such other information*" as necessary to provide an understanding of corporate conditions); *Disclosures in MD&A About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations*, SEC Release No. 8182, 2003 WL 175446, at *2 (Jan. 28, 2003) (providing that "[t]he disclosure in MD&A is of paramount importance in . . . providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions.").[7]

---

6    The Registration Statement here specifically concedes the materiality of Xue to the Company: "If one or more of our key management personnel are unable or unwilling to continue in their present positions, we may not be able to replace them easily or at all. The loss of the services of our key management personnel, in the absence of suitable replacements, could have a material adverse effect on our operations and financial condition, and we may incur additional expenses to recruit and train personnel." ¶29. Thus, Defendants expressly concede that Xue's resignation could have a material and adverse effect on the Company's operations and financial condition.

7    Moreover, disclosure of financial trends is not the only scenario encompassed by Item 5(D), which also requires disclosure of "demands, commitments or events," or by Item 303, which the SEC has interpreted to include disclosure of "demand[s], commitment[s], event[s] or uncertaint[ies]" 1989 Interpretive Release at *4. Xue's compensation demands and threats to resign also clearly fall within the rubric of demands, commitments or events. *See* Def. Mem. at 15, n.8.

*Even if* Items 5(D) and 303 did *only* apply to "trends discernible from hard information alone" (Def. Mem. at 13, 17 (quoting *Glassman v. Computervision Corp.*, 90 F. 3d 617, 631 (1st Cir. 1996)), such as "liquidity[,] . . . capital resources, . . . revenue and income" (Def. Mem. at 16 (quoting SEC Release No. 33-6231, 20 S.E.C. Docket 1059, 1072 (Sept. 2, 1980)) – and they do not – disclosure would still be required here. The compensation negotiations and Xue's resignation had a direct impact on Agria's revenues and income, leading to a $9.2 million charge in the first quarter of 2008 (and causing Agria to report a quarterly loss instead of a planned profit). ¶50. That impact was not "'soft' information in the nature of projections" (Def. Mem. at 13 (quoting *Shaw*, 82 F.3d at 1211 n.21)), but was readily ascertainable as soon as Xue made his demands and threatened to resign, prior to the IPO.

Further, the cases relied upon by Defendants in support of their argument that the compensation negotiations at issue here amount to "soft" information and Item 303 only requires disclosure of "hard" information, actually involved situations where *forward-looking projections* were not required to be disclosed. In *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996), the court reasoned that since Instruction 7 to Item 303 "expressly states that forward-looking information need not be disclosed" pursuant to the safe-harbor provision, there was no duty to disclose discrepancies between interim financial information and internal projections, because the projections were forward-looking information. The court in *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1211-1211 n.2 (1st Cir. 1996), *upheld* plaintiffs' complaint alleging that the prospectus was required to disclose interim financial data under Item 11(a) of Form S-3, and noted in *dicta* it was "sustainable only to the extent it relates to the non-disclosure of 'hard' material information, as opposed to 'soft' information in the nature of projections," because such projections would be protected by the safe-harbor provision of SEC Rule 175. In *In re Verifone Sec. Litig.*, 784 F. Supp.

1471, 1483 (N.D. Cal. 1992), a pre-PSLRA case brought under the Exchange Act, the court likewise held that a forecast made in good-faith and with a reasonable basis, which turned out to be inaccurate, did not produce liability because the forward-looking information was protected by the safe harbor provision of Rule 175. Similarly, in *In re Sofamar Danek Group*, Inc., 123 F.3d 394, 402 (6th Cir. 1997), also a case which discusses the disclosure obligations under the Exchange Act, the court reasoned that "'forward-looking information' . . . need not be disclosed," and held that since the company had "no way of knowing" that its merchandising practices "would have a material adverse impact upon future operating results," disclosure was not required.[8] Here, Xue's demands and threats were "events" that had already occurred by the time of the IPO, and were not forward-looking information. Whatever the outcome of these events turned out to be, they created an uncertainty that was reasonably likely to have a material impact on Agria's financial condition, and disclosure was therefore required.

Nor is the court's analysis in *In re Humana Inc. Sec. Litig.*, No. 3:99-CV-0398-S, 2000 U.S. Dist. LEXIS 21671 (W.D. Ky. Nov. 7, 2000), "directly on point" as Defendants contend. Def. Mem. at 14. In that case, the court in the Western District of Kentucky considered whether a duty to disclose existed, where plaintiff alleged a violation of the Exchange Act for failure to disclose that negotiations with a client over the renewal of a contract were not likely to end on favorable terms. *Id.* at *11-*12. In finding that there was no duty to "update the public on *the status* of contract negotiations," the court noted that "the status of the contract negotiations was not a 'presently known

---

8    In *Ark. Pub. Employee Retirement Sys. v. GT Solar Int'l, Inc.*, No. 08-cv-312-JL, 2009 U.S. Dist. LEXIS 93820, at *27 n.11 (D.N.H. Oct. 7, 2009), the Court never decided the issue of whether defendants' failure to disclose the substantial likelihood that it would loose a major customer was a violation of Item 303. The court stated, "because the plaintiff has successfully pled claims for the nondisclosure based on the allegedly misleading statements in the prospectus, the court need not – and does not decide – whether plaintiff has also pled a nondisclosure claim based on Item 303." *Id.*

fact' and would have required the Defendants to predict the outcome of those negotiations." *Id.* at *13. As the court stated: "the hard information, according to the Plaintiffs, is the fact that the . . . negotiations were going poorly." *Id.* at *12. The court reasoned that, "[t]he fact that Humana may have known that 'it wasn't going to be ***as good of a contract as in the past***,' is not a historical fact or something that is objectively verifiable. Instead, it is 'soft' information which, by its very nature, was a matter of opinion." *Id.*

Here, by contrast, the disclosure obligation concerns the ***existence*** of Xue's compensation negotiations and resignation threats – not the outcome of the negotiations or a commentary on their likely outcome, but rather the objective fact that such negotiations were taking place. This is also not a situation where an executive was merely seeking to renew an employment contract on terms that generally would not be "as good . . . as in the past" for Agria. *Humana*, 2000 U.S. Dist. LEXIS 21671, at *12. Rather, the fact that – at the very time that the Company was conducting an IPO – the key executive who provided Agria with the link to P3A so that it could operate in China, was demanding $18 million in cash and a transfer of shares representing a 22% ownership interest, was clearly "objectively verifiable" and not "a matter of opinion." *Id.* That Xue had threatened to resign from Agria if his demands were not met was likewise a hard fact. Defendants were not required to predict the likelihood of either outcome, but they were required to inform investors about these facts in the Registration Statement, since they were "uncertaint[ies] . . . that [were] reasonably likely to have a material effect on the company's . . . revenues, income from continuing operations, [and] profitability." Item 5(D).

A number of the cases that Defendants cite in support of their argument that they had no duty to disclose Xue's compensation demands and resignation threats involve alleged violations of the Exchange Act. Defendants argue that those cases apply with equal force here, even though Plaintiff

has alleged violations of the Securities Act, since Regulation S-K governs filings under both Acts. *See* Def. Mem. at 11-13. The fact that Regulation S-K provides uniform disclosure requirements, however, does not mean that the analysis of whether an omission of information required to be disclosed by Item 303 gives rise to liability is the same under both Acts.

Courts addressing this issue have expressly held that the analysis is different. In *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000), the Third Circuit considered and rejected the plaintiffs' argument that Item 303 created "a duty of disclosure that, if violated, constitutes a material omission under Section 10(b) of the Securities Exchange Act and Rule 10-b5." *Id*. at 287. The court examined the two-part test set forth by the SEC in the 1989 Interpretive Release for determining whether disclosure is required under Item 303, *id*. at 287; *see also* ¶39, and concluded that it "varie[d] considerably from the general test for securities fraud materiality set out by the Supreme Court in *Basic, Inc. v. Levinson*, [485 U.S. 224, 237, (1988)], which premised forward-looking disclosure 'upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id*. at 288. The court also reasoned that the SEC had specifically cautioned that "'the probability/magnitude test for materiality approved by the Supreme Court in *Basic* . . . is inapposite to Item 303 disclosure'; ***rather, SK-303's disclosure obligations extend considerably beyond those required by Rule 10b-5***." *Id*. (quoting Exchange Act Release No. 34-26831, 54 Fed. Reg. at 22430 n.27). Based on this analysis, the Third Circuit held that, "***[b]ecause the materiality standards for Rule 10b-5 and SK-303 differ significantly, the 'demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5. Such a duty to disclose must be separately shown***.'" *Id*. at 288.

In *Steckman*, 143 F.3d at 1296, the Ninth Circuit held that "[a]llegations which state a claim under Item 303(a) of Regulation S-K also sufficiently state a claim under Sections 11 and 12(a)(2)." The court made clear, however, that its holding did not extend to claims under Section 10(b) or Rule 10b-5, stating:

> The underwriters point to numerous decisions which decline to find liability merely because Item 303 was violated. However, the cases upon which the underwriters rely were all decided under section 10(b). *Section 10(b) of the Exchange Act, which has only an implied right of action, differs significantly from Sections 11 and 12(a)(2) of the Securities Act, which have express rights of action*.

*Id.* at 1296. Thus, while a duty to disclose, apart from Item 303, must be separately shown to establish liability under Section 10(b) and Rule 10b-5, *Oran*, 226 F.3d at 288, a violation of the disclosure requirements of Item 303 – as has been alleged here – will automatically give rise to liability under Section 11. *Steckman*, 143 F.3d at 1296. While the Second Circuit has not squarely decided this issue, district court cases are in accordance with the reasoning of *Oran* and *Steckman*. *Compare, e.g.*, *Initial Pub. Offering*, 358 F. Supp. 2d at 211 ("An omission of fact 'required to be stated' under Item 303 will generally produce liability under Section 11") with *In re Quintel Entertainment Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 293 (S.D.N.Y. 1999) (noting that although "when companies violate Item 303 of SEC Regulation S-K, they often violate §10(b) as well, violations of Item 303 do not necessarily" lead to liability under the Exchange Act); *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1210-11 (S.D.N.Y. 1996) (noting that "[i]t is far from certain that the requirement that there be a duty to disclose under Rule 10b-5 may be satisfied by importing the disclosure duties from S-K 303," *Id.* at 1210 n.4, and concluding that Item 303 did not create a duty to disclose sensitive pricing decisions and competitive marketing strategies for purposes of Rule 10b-5). Accordingly, the Exchange Act cases relied upon by Defendants here are inapposite and of little assistance.

- 17 -

### D.    The SCAC Adequately Alleges an Actionable Omission

Defendants contend that the failure to disclose the negotiations between Xue and Lai, including Xue's threat to resign from his position as COO, was immaterial because: (1) of the "extensive disclosures of the very risk that management *might* resign";[9] and (2) the alleged omission had no "legal significance" since Xue had a binding employment contract with Agria. Def. Mem. at 21; *see also id*. at 18-20. Because Defendants failed to disclose the specific, then-existing risk that Xue might resign – and because that risk had *actual* significance – their arguments fail.

Defendants argue that their failure to disclose Xue's compensation demands and threats to resign "is immaterial as a matter of law," because the Registration Statement contained certain risk disclosures about the potential impact on Agria if an executive were to leave. Def. Mem. at 18; *see also* ¶¶29, 33. While these warnings establish the materiality of the risk to the Company if a member of its management was to resign, they do *not* absolve Defendants of liability under Sections 11 and 12(a)(2).

According to the Second Circuit: "Under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of *adequate cautionary language* set out in the same offering.'" *Rombach*, 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)). The Second Circuit has also held, however, that, "[t]he cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass – *in dealing with the contingent or unforeseen future*. Historical or

---

9    Contrary to what Defendants argue, there is no disclosure in the Registration Statement that management "might" resign. Indeed, that is precisely what Plaintiff alleges should have been disclosed but was not. ¶¶29, 33. Rather, the Registration Statement discusses the impact on Agria in the event that one of its "key management personnel [is] unable or unwilling to continue in their current positions." ¶29.

present fact – knowledge within the grasp of the offeror – is a different matter." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

The warnings on which Defendants rely warn potential purchasers of the general risk that management **could** leave the Company, but they do not disclose the specific, existing, and very real risk that Xue, who held one of the most important positions in the Company, was threatening to resign if he did not receive an additional $18 million in cash and transfer of shares. Because the Registration Statement failed to reveal that specific risk, the cautionary language in question cannot be considered "adequate" under Second Circuit case law. *See*, *e.g.*, *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d at 417 ("no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred"). As a result, the bespeaks caution doctrine cannot relieve Defendants from liability.[10]

Attempting to resuscitate an irrelevant argument from Agria's motion to dismiss, Defendants also contend that, because various contracts with P3A and Xue "governed the arrangements between Agria and its executives," Xue's negotiations with Guanglin Lai ("Lai") (including his threat to resign his position as COO) "could not have any legal significance[,]" since "any oral discussions would have no impact on Agria's ability to confirm that Xue was contractually bound to Agria."

---

10    Although the Court held – prior to the inclusion of Plaintiff's allegations in the SCAC regarding the duty to disclose Xue's demands and threats under Items 5D and 303 – that the Registration Statement "disclose[d] the importance of the relationship among Agria, and its officers and the consequences that could flow from an officer's departure . . . [and did] not downplay the possibility of negotiations about compensation or paint too rosy a picture of P3A management[,]" *Agria*, 2009 U.S. Dist. LEXIS 110914, at *20, the Court also held that undisclosed compensation negotiations and Xue's threats to resign "presented 'a significant risk to Agria's operations and financial conditions." *Id*. at *21. As discussed above, because that risk was reasonably likely to have a material effect on Agria and its future financial performance, disclosure was required under Items 5(D) and 303.

Def. Mem. at 20.  Whether or not Xue's negotiations and threats to resign had any "legal" significance, they clearly had actual significance.

Lead Plaintiff cites Xue's discussions with Lai ***not*** to vary or contradict the terms of Xue's contract with Agria, as Defendants suggest,[11] but to demonstrate the existence of a material risk to Agria's business that Defendants failed to disclose in the Registration Statement:  the risk that, in the absence of a successful compensation negotiation, Xue would resign his position as COO.  The existence of a binding employment agreement is utterly irrelevant to this risk; Xue could – and did – resign his position with Agria, whether or not he was permitted to do so by the operative agreement. Yet Defendants never disclosed that risk, which existed at the time of the IPO, in violation of the federal securities laws.

### E.    The SCAC Adequately Alleges that Defendants Violated Section 12(a)(2)

Plaintiff has adequately pled that Defendants were "sellers" of securities under Section 12(a)(2) by alleging that each signed the Prospectus which contained untrue statements of material fact.  *See Pinter v. Dahl*, 486 U.S. 622, 647 (1988).

Defendants' only challenge to Plaintiff's Section 12(a)(2) claim is their citation to cases outside of this Circuit for the general proposition that simply signing a prospectus is insufficient to qualify an individual as a seller.  Def. Mem. at 22-23.  Defendants' argument is at odds with the district courts in this Circuit, however, that have held that officers and directors who sign a registration statement are liable under Section 12(a)(2) because they are deemed to have solicited purchases.  As Judge Stanton recently observed in a similar case, "[n]umerous courts in this circuit

---

11    Defendants' argument that "it is hornbook contract law that extrinsic evidence of negotiations are [*sic*] immaterial as a matter of law and legally inoperative to vary or contradict the unambiguous terms of a full integrated contract, such as Xue's employment agreement in this case" is completely irrelevant.  Def. Mem. at 20 n.9.

hold that on a motion to dismiss, officers or directors of the stock issuer who signed its registration statement are deemed to have solicited the purchase of the offered stock." *Briarwood Invs. Inc. v. Care Inv. Trust Inc.*, No. 07 Civ. 8159 (LLS), 2009 U.S. Dist. LEXIS 18963, at *13 (S.D.N.Y. Mar. 4, 2009); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005) ("An officer or director who signs a Registration Statement containing materially false or misleading statements or omissions is deemed, for pleading purposes, to have solicited a purchase within the meaning of [§12(a)(2)]."); *Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761, at *23 (S.D.N.Y. Sept. 20, 2001) ("A person who signs a registration statement is deemed to have solicited the purchase of the offered securities."); *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *32 (S.D.N.Y. Nov. 19, 1999) ("Courts have concluded that because the prospectus itself is a document that solicits the purchase of securities, those who sign the registration statement should be deemed persons who solicited the purchase of the offered securities."); *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) (denying dismissal of claim under predecessor to §12(a)(2) and stating that, "it is, at this stage of the proceedings, a sufficient allegation to permit Plaintiffs to present evidence that, alone or in tandem with other acts, the signatures constituted active solicitation").

Plaintiff has alleged that each Defendant was a director of Agria who signed the Registration Statement (of which the Prospectus forms a part) in connection with the IPO, *see* ¶¶12, 15 and 22, and that Defendants' "actions of solicitation included preparing the inaccurate and misleading Prospectus and participating in efforts to market the IPO to investors." ¶70. Because Plaintiff has pled that Defendants were directors who signed the Registration Statement containing untrue

statements of material fact, Plaintiff has adequately alleged that Defendants "solicited the plaintiff's

purchase" of Agria securities under Section 12(a)(2).  *Pinter*, 486 U.S. at 647. [12]

> **F.      Plaintiff Timely Served the CAC or Can Establish an Entitlement to Excusal
> from Imperfect Service**

        Defendants acknowledge that Plaintiff properly effectuated service of process on them on

May 22, 2009, ***within 120 days*** of the filing of the CAC on February 3, 2009.  *See* Fed. R. Civ. P.

4(m); *see also* Docket Nos. 39-40 (Affidavits of Service). [13]  Because the CAC superseded the initial

complaints (certain of which named Defendants), such service satisfied the policy underlying Rule

4(m), whose principal objective is to ensure that a defendant has adequate notice of the claims

alleged against him.  Any suggestion to the contrary is baseless.  *See, e.g.*, *In re Sunbeam Sec. Litig.*,

89 F. Supp. 2d 1326, 1343 (S.D. Fla. 1999) (rejecting a defendant's contention that service of a

consolidated amended complaint within 120 days of its filing was insufficient under Rule 4(m),

where, as here, he was named in an initial complaint that had not been served on him).  This is

particularly so in the unique context of securities class action litigation, in which a court must

appoint a lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 and, after

---

[12]      Because the Section 11 and 12(a)(2) claims stand, the Section 15 claim does as well.  *See
Briarwood Invs.*, 2009 U.S. Dist. LEXIS 18963, at *14-*15.  Moreover, even if the underlying
Section 11 and 12(a)(2) claims are dismissed against Defendants, if the Court grants Plaintiff's
pending motion for reconsideration (Docket No. 48-49, 53) and reinstates Plaintiff's claims against
Agria, Defendants could still be held liable as control persons under Section 15 with respect to any
primary violations of the Securities Act that Agria is alleged to have committed.

[13]      Since, as Defendants admit, they were served within 120 days of the filing of the CAC, it is
irrelevant that Plaintiff served them "five months after being appointed Lead Plaintiff."  Def. Mem.
at 24.

appointment and consolidation, the lead plaintiff customarily files a consolidated amended complaint. *See id.*[14]

Moreover, "good cause" exists to excuse strict compliance with Rule 4(m)'s 120 day period under the circumstances of this case even if service is deemed to have not been properly effectuated here. To determine whether good cause exists, a court will consider whether (i) "'the plaintiff made reasonable efforts to serve the defendant'" and (ii) the defendant will suffer prejudice "'by the delay in service.'" *Chrobak v. Hilton Group PLC*, 06 Civ. 1916 (MGC), 2007 U.S. Dist. LEXIS 59646, at *10 (S.D.N.Y. Aug. 16, 2007) (quoting *Shider v. Communications Workers of America*, No. 95 Civ. 4908, 1999 U.S. Dist. LEXIS 13184, at *7 (S.D.N.Y. Aug. 30, 1999)).

Here, Plaintiff did not file an initial complaint and thus could not have undertaken any effort to previously serve Defendants – a fact that should not now count against him. In any event, Defendants, who were aware of the claims alleged against them since the filing of the initial complaints, have suffered absolutely no prejudice by a delay in service (to the extent there was any). Defendants are represented by Latham & Watkins LLP ("L&W"), the same law firm responsible for Agria's defense. In addition to reiterating in this motion many of the same arguments raised in Agria's motion to dismiss (Docket No. 32), they have also incorporated by reference all of the arguments in that motion. Def. Mem. at 1. *See Chrobak*, 2007 U.S. Dist. LEXIS 59646, at *11 (declining to find good cause but exercising discretion to extend the time for service where the

---

14    *Durgin v. Mon*, 659 F. Supp. 2d 1240, 1258 (S.D. Fla. 2009), cited to by Defendants, is inapposite. In *Durgin*, a replacement lead plaintiff failed to timely serve an amended complaint that had been filed by an earlier-appointed lead plaintiff (who had been appointed by the court to act on behalf of the class). *Id*. at 1258 n.7. Here, by contrast, the plaintiff who filed the initial complaint – but did not serve Defendants – was never appointed by the Court to act on behalf of the Class. Thus, the CAC filed by Lead Plaintiff was the only complaint in this action that was filed by a party authorized by the Court to act on behalf of the Class. As such, the CAC is the first complaint that needed to be – and was – timely served.

defendant did not articulate any prejudice, received notice of the claims alleged against it, and was represented by counsel for other defendants who had been timely served).

Furthermore, "[e]ven in the absence of good cause, a district court may extend the period for service[,]" or excuse imperfect service, "as an exercise of discretion." *Shider*, 1999 U.S. Dist. LEXIS 13184, at *10 (citing Rule 4(m)). In determining whether to exercise such discretion, a court will principally consider whether "a combination of dismissal and the statute of limitations would effectively result in a dismissal with prejudice." *Ladmen Partners, Inc. v. Globalstar, Inc.*, 07 Civ. 0976 (LAP), 2008 U.S. Dist. LEXIS 76670, at *21 (S.D.N.Y. Sept. 30, 2008) (citing *Zapata v. City of New York*, 502 F.3d 192, 196-97 (2d Cir. 2007)). A court will also consider, *inter alia*, "whether the defendant had actual notice of the claims asserted" or "attempted to conceal the defect in service. . . ." *Bunim v. City of New York*, Case No. 05-CV-1562 (KMK), 2006 U.S. Dist. LEXIS 50309, at *9 (S.D.N.Y. July 24, 2006).

Consideration of these factors favors the excusal of any imperfect service or, if necessary, warrants a finding that Plaintiff has properly effectuated service *nunc pro tunc*. First, Defendants contend that Plaintiff's claims would be time-barred if dismissed at this juncture – a fact that, if true, would weigh heavily ***in favor*** of excusing service. Def. Mem. at 24-25. Indeed, as Judge Sotomayer held in *Shider*, "where, as here, the applicable statute of limitations would bar a plaintiff from refiling her action, a court may be justified in granting a discretionary extension of the period for service, whether or not the plaintiff has demonstrated good cause for his or her failure to effect service within the Rule 4(m) period." 1999 U.S. Dist. LEXIS 13184, at *10.

Second, Defendants had actual notice of the claims alleged against them in the CAC long before its filing. As noted above, both Defendants were named as adverse parties in certain of the initial complaints. In addition, L&W, which also represents Agria, formally appeared in those

- 24 -

actions.  In fact, James J. Farrell, Esq., one of the L&W attorneys who authored Defendants'

memorandum of law in support of their motion to dismiss, filed a Notice of Appearance *on behalf of

McCarthy* and other defendants in the *Lodermier* case (Case No. 08 Civ. 4456) nearly a year ago,

prior to the appointment of Lead Plaintiff and consolidation of the other pending matters.  *See*

*Lodermier* Docket No. 9 (July 16, 2008 Notice of Appearance).  To require any further notice under

these circumstances would, once again, contravene the objective of Rule 4(m).  *See Tishman v. AP*,

05 Civ. 4278 (GEL), 2005 U.S. Dist. LEXIS 34356, at *4 (S.D.N.Y. Dec. 16, 2005) (defendants had

actual notice and sought to defend claims on merits).

Finally, to the extent that Defendants have established an entitlement to dismissal on the

grounds of imperfect service (which they have not), the SCAC contains claims that "relate back" to

the initial complaints and thus should remain unaffected by any expiration of the statute of

limitations in the intervening time period between the filing of such complaints.  *See Sciotti v.*

*St.-Gobain Containers, Inc.*, 06-CV-6422 CJS, 2008 U.S. Dist. LEXIS 40382, at *14-*15

(W.D.N.Y. May 19, 2008).

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny

Defendants' motion to dismiss in its entirety.

DATED:  March 4, 2010                COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP
                                     SAMUEL H. RUDMAN
                                     DAVID A. ROSENFELD
                                     ERIN W. BOARDMAN


                                            /s/ *David A. Rosenfeld*
                                     DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

*Additional Counsel for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice, and I hereby certify that I have mailed the foregoing document by first-class mail to all additional counsel on the attached service list.

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

AGRIA CORP.

Service List - 3/4/2010    (08-0084)

Page 1 of  1

### Counsel For Defendant(s)

James J. Farrell
Wendy P. Harper
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
  213/485-1234
  213/891-8763 (Fax)

Lawrence J. Byrne
A. Hyun Rich
Paul S. Hessler
Linklaters LLP
1345 Avenue of the Americas
New York, NY  10105
  212/903-9000
  212/903-9100 (Fax)

### Counsel For Plaintiff(s)

Samuel H. Rudman
David A. Rosenfeld
Erin W. Boardman
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)

Robert J. Dyer III
Jeffrey A. Berens
Dyer & Berens LLP
303 East 17th Street, Suite 300
Denver, CO  80203
  303/861-1764
  303/395-0393 (Fax)

Michael I. Fistel, Jr.
Marshall P. Dees
Holzer Holzer & Fistel, LLC
200 Ashford Center North, Suite 300
Atlanta, GA  30338
  770/392-0090
  770/392-0029 (Fax)